CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA FILED
12/29/2025

LAURA A. AUSTIN, CLERK
BY: s/ J. LOPEZ
    DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# HARRISONBURG DIVISION

**CAROLYN OLECH, D.V.M.**,

Plaintiff,

CASE NO. 5:25CV152

v.

**MICHAEL STAPLETON ASSOCIATES, LTD.**
**d.b.a. MSA SECURITY, INC.**,

**COMPLAINT**

Defendant.

**JURY DEMAND**

## I. INTRODUCTION

1. Plaintiff Dr. Carolyn Olech (hereafter "Plaintiff" or "Dr. Olech") files this Complaint of discrimination against her former employer Michael Stapleton Associates, Ltd. d.b.a. MSA Security, Inc., (hereafter MSA or Contractor) for violation of 41 U.S.C. § 4712. This discrimination was in retaliation for Plaintiff reporting gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, and/or a violation of law, rule, or regulation related to a Federal contract, including via participating in federal agency and congressional investigations into said gross mismanagement, fraud, and mistreatment of canines, including medical malpractice by intoxicated and impaired medical staff, violation of animal protection and veterinary licensing laws, and abuse of authority by MSA management in failing to remediate the malpractice and retaliation. The discriminatory acts included retaliatorily investigating and terminating Plaintiff Dr. Olech.

## II. JURISDICTION

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 on the basis that this complaint arises and presents federal questions under 41 U.S.C. § 4712, sub-titled "Enhancement of contractor protection from reprisal for disclosure of certain information."

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

3. Dr. Olech administratively exhausted her claims under 41 U.S.C. § 4712(c)(2) on or after June 25, 2024. Hence, this action is timely pursuant to 41 U.S.C. § 4712(c)(2).

4. Dr. Olech filed her complaint with the State Department Office of Inspector General (hereafter "OIG") on February 2, 2023.

5. On January 2, 2024, the State Department Inspector General, Mr. Jeffrey D. McDermott, forwarded his report of the investigation of Dr. Olech's complaint to the Procurement Executive. The OIG found that while Dr. Olech made at least one protected disclosure that contributed to the termination of her employment, MSA provided clear and convincing evidence that it would have taken the adverse personnel actions regardless of her disclosures.

6. On June 25, 2024, the Division Director of the Office of the Procurement Executive of the United States Department of State, Ms. Sharon D. James, denied Dr. Olech relief under 41 U.S.C. § 4712. Ms. James did the same with regards to the previous conclusion in favor of Plaintiff Olech's colleagues, Dr. Karen Iovino and Mr. Garrett Lancaster, who also filed retaliation complaints after they made protected disclosures and were terminated by Defendant. Given her prior involvement with the MSA Project and Ms. James' predisposition to overturn

OIG decisions in favor of Iovino, Lancaster, and Olech, the apparent conflict of interest gives rise to a denial of due process.

## IV. VENUE

7. Venue lies in this United States District Court under 28 U.S.C. § 1391(b) and (c) by virtue of the fact that the Defendant, during relevant times, did business in this district.

## V. PARTIES

8. Plaintiff Dr. Olech is a citizen of the United States and resident of the Commonwealth of Virginia. Plaintiff Dr. Olech was an "employee of a contractor" within the meaning of 41 U.S.C. § 4712(a)(1). Defendant hired Plaintiff in June 2016 as a veterinarian. Dr. Olech held this position until Defendant unlawfully terminated her on July 19, 2022. Because Plaintiff Dr. Olech was employed by the Defendant under Defendant's contract with the State Department, Plaintiff Dr. Olech was, at all relevant times, an employee of a federal contractor.

9. Defendant MSA is a company, headquartered in New York City, providing security, intelligence, training, and investigative services in the public and private sector. Defendant has a contract with the United States Department of State (hereafter "State Department" or DOS) under the Worldwide Protective Services (WPS) program to operate the Canine Validation Center (hereafter "CVC") in Winchester, VA. The State Department Bureau of Diplomatic Security (hereafter "DS") oversees this contract.

10. Canines A, B, and C are the dogs who were the victims of the medical malpractice and mistreatment as set forth in this Complaint.

## VI. STATEMENT OF GENERAL FACTS

11. On June 6, 2016, MSA hired Dr. Olech as a veterinarian responsible for the health care of the canines at the Canine Validation Center (CVC) in Winchester, Virginia. Dr. Olech served in this position until MSA terminated her employment on July 19, 2022.

12. The CVC underwent several name changes between June 2016 and February 2022, including the Diplomatic Security Canine Center (DSCC), the Diplomatic Security Canine Training and Operations Center (DSCTOC), and finally the Diplomatic Security Global Canine Center (DSGCC). For simplicity, this complaint refers to the facility as the CVC throughout.

13. The CVC conducts training pursuant to two State Department programs: 1) the Worldwide Protective Services program (WPS), which deploys canines and handlers to protect State Department facilities and personnel worldwide; and 2) the Anti-Terrorism Assistance (ATA) program, which supplies foreign law enforcement agencies with Explosive Detection Canines (EDC) and trains handlers to care for these canines.

14. In March 2016, the Bureau of Diplomatic Security's Office of Antiterrorism Assistance signed a Memorandum of Agreement with the CVC that established responsibility for the care requirements of dogs provided to foreign countries with CVC.

15. Shortly after Dr. Olech's start of employment, MSA hired Jennifer Houston as a Licensed Veterinary Technician (LVT) on July 19, 2016. As an LVT, Ms. Houston was authorized to perform various medical procedures on the canines, including administering medications and anesthesia, monitoring vital signs during surgery, performing laboratory tests, and providing nursing care.

16. From mid-2016 through the end of 2018, Dr. Olech raised concerns to her supervisors, including the Program Manager (PM) and Deputy Program Manager (DPM), about Ms. Houston's chronic tardiness, absences, and apparent alcohol use before and during work

hours. Dr. Olech reported that Ms. Houston's behavior compromised the care provided to the canines and posed a risk to their health and safety.

17. Dr. Olech also participated in OIG investigations and provided information about the mistreatment of canines, including issues related to Ms. Houston's conduct.

18. In early 2019, the Virginia Department of Health Professions (DHP) investigated Ms. Houston's misconduct regarding alcohol abuse. Dr. Olech was interviewed and provided evidence during this investigation. As a result, in 2020, Ms. Houston indefinitely lost her license to practice as a veterinary technician in Virginia.

19. Despite the loss of her license, MSA continued to employ Ms. Houston at the CVC in an administrative position.

20. On August 6, 2021, a serious incident occurred involving a canine in MSA's training program. The canine latched onto a trainer's arm, requiring physical separation. During the incident, MSA employees administered tranquilizers to subdue the canine. Dr. Olech arrived during the incident and witnessed some of these interactions. She subsequently created an Encounter Note documenting the incident in MSA's internal record-keeping system, ClioPro.

21. On February 7, 2022, the Virginia DHP sent notice to Ms. Houston and another veterinarian that it was investigating allegations that Ms. Houston had operated as a veterinary technician without a valid license when tending to the canine during the August 6, 2021 incident. The notice included the Encounter Notes written by Dr. Olech.

22. Following this notice, MSA conducted an internal investigation into how the DHP obtained the Encounter Notes. On February 24, 2022, based on the findings of this investigation, MSA placed Dr. Olech on paid administrative leave.

23. On July 8, 2022, MSA's outside counsel interviewed Dr. Olech. During this interview, Dr. Olech admitted to emailing Department documents, including canine records and incident reports, to her personal email address.

24. On July 18, 2022, Dr. Olech was interviewed by the Virginia DHP regarding the August 6, 2021 incident. She provided information about the treatment of the canine and MSA's failure to create certain reports following the incident.

25. On July 19, 2022, MSA terminated Dr. Olech's employment, citing violations of MSA's Code of Conduct and the Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement.

26. Throughout her employment, Dr. Olech consistently acted to protect the health and welfare of the canines under her care, reporting misconduct and participating in investigations to ensure proper treatment of the animals and adherence to veterinary standards and laws.

## VII. PROTECTED ACTIVITY FACTS

27. Dr. Olech engaged in numerous protected activities throughout her employment with MSA, consistently reporting misconduct and participating in investigations to ensure proper treatment of the animals and adherence to veterinary standards and laws.

28. Shortly after starting her employment in June 2016, Dr. Olech began observing and reporting issues regarding the Licensed Veterinary Technician (LVT) Jennifer Houston. Dr. Olech, along with her colleague Dr. Karen Iovino, reported to their superiors that Ms. Houston habitually missed work, showed up late for duty, left early, and often smelled of alcohol before coming to work.

29. On numerous occasions between 2016 and 2018, Dr. Olech reported to her supervisor, Dr. Michael Ratcliff, that Ms. Houston appeared to be intoxicated at work and that her impairment posed a risk to the canines under the CVC's care as well as to her co-workers.

30. On December 21, 2016, Dr. Olech reported an incident where Ms. Houston failed to turn on the oxygen supply for a canine named Blake during surgery, a severe lapse that could have resulted in the canine's death.

31. On February 11, 2017, during a weekly veterinarians' meeting, Dr. Olech disclosed to Dr. Ratcliff that Ms. Houston's pattern of repeated absences and tardiness was threatening the mission of the CVC, as Ms. Houston's participation was required for mission-critical procedures.

32. Throughout 2017 and 2018, Dr. Olech continued to report Ms. Houston's alcohol issues, chronic unreliability, and lack of fitness for duty to her superiors, including Dr. Ratcliff and Program Manager Mike Hayes.

33. On multiple occasions in 2018, including February 26, March 26, April 11, and October 10, Dr. Olech had to remove Ms. Houston from direct patient care due to her apparent intoxication. Dr. Olech reported each of these incidents to Dr. Ratcliff.

34. On June 22, 2018, Dr. Olech created a Memorandum for Record (MFR) about an incident where Ms. Houston failed to comply with previously dictated instructions to notify supervisors of late arrivals or absences from work.

35. In late June 2018, Dr. Olech requested a meeting with Dr. Ratcliff and PM Mike Hayes to discuss her concerns regarding Ms. Houston's chronic tardiness, insubordination, and behavior consistent with intoxication while on duty. This request was denied.

36. On October 15, 2018, Dr. Olech submitted an Incident Report to CVC PM Mike Hayes regarding Ms. Houston's intoxication on October 10, 2018, which occurred during a VIP tour of the Veterinary Hospital.

37. On October 31, 2018, Dr. Olech again had to remove Ms. Houston from her patient care duties due to apparent intoxication. Dr. Olech submitted an Incident Report about this event on November 2, 2018.

38. In early November 2018, when Mr. Hayes refused to accept documentation about Ms. Houston's incidents, Dr. Olech escalated her concerns to Peter Deegan, a vice president of human resources in MSA's corporate headquarters in New York.

39. Dr. Olech participated in multiple OIG investigations. On June 27, 2018, she was interviewed by OIG investigators and discussed her concerns about Ms. Houston's alcohol issues, allegations of illegal amputation of a canine named Frank, mistreatment of canines, misuse of government property, and other issues related to the CVC's operations.

40. On August 22, 2018, Dr. Olech met again with OIG investigators to discuss the care of ATA canines in host countries and the case of a deceased ATA Jordan canine named Mencey.

41. In early 2019, Dr. Olech participated in an investigation by the Virginia Department of Health Professionals (DHP) regarding Ms. Houston's alcohol abuse. Dr. Olech provided evidence during this investigation, which ultimately led to Ms. Houston's veterinary technician license being indefinitely suspended in 2020.

42. On July 8, 2022, Dr. Olech was interviewed by an Investigator from the Virginia Board of Veterinary Medicine regarding the events of August 6, 2021, and the death of canine Cezar 2485. During this interview, Dr. Olech cooperated and reported her observations of the incident.

43. Throughout her employment, Dr. Olech consistently raised concerns about inappropriate medical practices, including the prohibition on outsourcing specialized veterinary tests, which she believed put the health and welfare of the canines at risk.

44. Dr. Olech's protected activities were in concert with and in support of the reports of her fellow MSA employees Dr. Karen Iovino and Garrett Lancaster, both of whom also faced retaliation for their whistleblowing activities.

45. Dr. Olech's advocacy on behalf of the animals was both internal to Virginia-based Contractor supervisors and MSA headquarters managers in New York, and external to the DOS OIG and state veterinary officials. She consistently urged corrective actions against MSA's medical personnel who were committing malpractice, supervisors who neglected and abused their positions in failing to take corrective actions to protect the canines, and company officials failing to maintain and manage a program that met the operational goals of the contract.

## VIII. ADVERSE ACTIONS AND HOSTILE WORK ENVIRONMENT FACTS

46. In retaliation for Dr. Olech's protected disclosures and activities, MSA subjected her to a series of adverse actions and created a hostile work environment. These actions included, but were not limited to, the following:

47. Shortly after October 15, 2018, when Dr. Olech submitted an Incident Report to CVC PM Mike Hayes regarding Ms. Houston's intoxication, Dr. Ratcliff verbally denigrated Dr. Olech as not being a "team player." Dr. Olech felt intimidated by Dr. Ratcliff even though she was following the proper chain of command.

48. In the face of Dr. Olech's continuing complaints about Ms. Houston, her superiors at MSA, including Mike Ratcliff and Alan Bower, began to marginalize Dr. Olech and diminish her prestige and authority in the workplace.

49. MSA began subjecting Dr. Olech to contradictory guidelines and instructions, increasing arbitrary criticisms, and downgrading her position. They began issuing unmerited discipline and excluding her from meetings she should have attended.

50. Beginning in June 2019, Dr. Olech would no longer be appointed the acting lead in Dr. Ratcliff's absence at any point in 2019 or 2020, despite having been the acting lead routinely in the past.

51. While other employees in 2019 were accommodated for medical needs or injuries, MSA denied similar accommodations to Dr. Olech.

52. On July 20, 2019, Dr. Ratcliff initiated an annual evaluation by falsely accusing Dr. Olech of a shortage of Gabapentin during the April 2019 controlled substances inventory. Dr. Olech reported that not only was the accusation based on inaccurate information, but she also did not have access to the controlled substances at the time the shortage occurred.

53. In late July 2019, MSA negatively counseled Dr. Olech in a group format for the Licensed Veterinary Technicians' July 2019 failure to properly document the Controlled Substance log, despite Dr. Olech not being responsible for this failure.

54. On August 28, 2019, MSA's Dr. Ratcliff (with Chief HR Officer Peter Capizzi cc'ed) gave Dr. Olech a retaliatory written employee counseling regarding the failure to bring a microchip scanner on the Dominican Republic (DR) Check Back trip. This counseling was unwarranted as no scanner had been available, Dr. Ratcliff had told her nothing was needed for her to bring, and no one at MSA had any knowledge of the K9s she was to see.

55. Dr. Olech was excluded from hiring decisions regarding new personnel, including new veterinarians. For instance, in October 2019 and again on December 30, 2019, MSA

announced the hiring of new veterinary staff without Dr. Olech's input or involvement in the hiring process.

56. MSA isolated and marginalized Dr. Olech as a means of removing her from the workplace.

57. On February 23, 2022, Dr. Ratcliff handed Dr. Olech a letter stating that she was being placed on administrative leave (with pay). Dr. Olech was told to hand over her credentials and electronic devices and was escorted off the premises.

58. The administrative leave letter falsely alleged that Dr. Olech had deleted and/or destroyed records generated during the performance of work under the Global Canine Center Contract. Dr. Olech did not delete or destroy these records.

59. On July 19, 2022, MSA terminated Dr. Olech's employment, but not on the grounds that she deleted or destroyed records as they originally claimed. Instead, MSA now claimed they were terminating on the grounds that she copied and preserved documentary evidence.  MSA claimed that Dr. Olech told them on July 6, 2022 that she had removed but not shared Department of State and MSA documents, including memorandums for reference and incident reports regarding MSA's performance of work for the Department of State, for "self-defense". MSA claimed that such document preservation violated MSA's Code of Conduct and Employee Confidentiality Agreement.  This termination occurred the day after Dr. Olech was interviewed by the Virginia Department of Health Professions regarding the August 6, 2021 incident involving canine Cezar and a few weeks after MSA stated they learned Olech had personally saved documentary evidence.

60. Throughout her employment, Dr. Olech was subjected to a pattern of retaliation and hostile work environment, including:

a. Exclusion from relevant meetings and decision-making processes
b. Unwarranted disciplinary actions
c. Denial of promotions and leadership opportunities
d. False accusations of misconduct
e. Interference with her ability to perform her job duties effectively
f. Attempts to discredit her professional reputation

61. The timing of MSA's actions, as well as the firm's pattern of overlooking or suppressing canine safety care concerns, Ms. Houston's dangerous workplace behavior, and other bad acts, strongly indicate that MSA was either retaliating against Dr. Olech for supporting Dr. Iovino's concerns and/or her legal claims or attempting to intimidate Dr. Olech into revoking that support.

62. MSA's actions would likely have a chilling effect on other employees who might otherwise consider providing truthful testimony unfavorable to MSA.

63. These adverse actions and the creation of a hostile work environment were directly related to Dr. Olech's protected activities and resulted in significant harm to her career, reputation, and livelihood.

## IX. <u>CLAIM FOR RELIEF: VIOLATION OF 41 U.S.C. 4712</u>

64. Plaintiff realleges and incorporates by reference paragraphs 1 through 63 above.

65. The facts of this case support a whistleblower retaliation claim under 41 U.S.C. § 4712(a)(1) which provides, in relevant part:

"An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant."

66. Dr. Olech was an employee of MSA, a federal contractor, within the meaning of 41 U.S.C. § 4712.

67. Dr. Olech made numerous protected disclosures to persons and bodies described in 41 U.S.C. § 4712(a)(2), including:

   a. Her supervisors and other management officials at MSA
   b. The Department of State Office of Inspector General (OIG)
   c. The Virginia Department of Health Professions (DHP)
   d. The Virginia Board of Veterinary Medicine

68. Dr. Olech reasonably believed that the acts, omissions, and misconduct she reported and objected to constituted:

   a. Gross mismanagement of a Federal contract
   b. A substantial and specific danger to public health or safety
   c. Violations of law, rule, or regulation related to a Federal contract
   d. Abuse of authority relating to a Federal contract

69. Dr. Olech's reasonable belief was based on her professional experience as a veterinarian, her knowledge of applicable laws and regulations, and her direct observations of misconduct and mismanagement at the CVC.

70. Dr. Olech's protected disclosures included, but were not limited to:

   a. Reports of Ms. Houston's chronic tardiness, absences, and alcohol abuse
   b. Concerns about inadequate medical care and improper medical practices
   c. Reports of mistreatment and endangerment of canines
   d. Disclosures of violations of veterinary licensing laws
   e. Reports of MSA's failure to address known issues and misconduct

71. MSA had actual and constructive knowledge of all of Dr. Olech's protected activities.

72. Dr. Olech's protected activities were a contributing factor in adverse actions taken against her, including but not limited to:

   a. Marginalization and diminishment of her authority
   b. Exclusion from meetings and decision-making processes
   c. Unwarranted disciplinary actions
   d. Placement on administrative leave

   e. Termination of her employment

73. The temporal proximity between Dr. Olech's protected disclosures and the adverse actions taken against her supports an inference of causation.

74. MSA's stated reasons for the adverse actions against Dr. Olech were pretextual and designed to cover up their retaliatory motives.

75. MSA's actions violated 41 U.S.C. § 4712 by discharging and otherwise discriminating against Dr. Olech as a reprisal for her protected disclosures.

76. As a direct and proximate result of MSA's unlawful actions, Dr. Olech has suffered and continues to suffer substantial losses in earnings, job experience, benefits and other employment benefits, and has incurred other economic losses.

77. As a further direct and proximate result of MSA's actions, Dr. Olech has suffered and continues to suffer impairment and damage to her good name and reputation, along with mental anguish and emotional distress.

78. The retaliatory actions taken by MSA against Dr. Olech were willful, deliberate, and in callous disregard of Dr. Olech's rights protected under 41 U.S.C. § 4712.

79. By reason of MSA's retaliation, Dr. Olech is entitled to all relief necessary to make her whole, including but not limited to reinstatement, back pay, front pay, compensatory damages, and other remedies provided by 41 U.S.C. § 4712.

## X. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dr. Carolyn Olech requests that the Court award her the following:

   a) Offer of reinstatement to employment with MSA at the same position she held before the reprisal, and if reinstatement is not ordered, then front pay for a period of at least five years;

b) Upon reinstatement, an injunction directing MSA to remediate the hostile work environment, harassment, and intimidation to which it subjected Plaintiff;

c) Back pay for all lost wages and benefits, including lost bonuses;

d) Economic damages for injury to Plaintiff's career, professional reputation, and earning capacity, in an amount to be determined at hearing;

e) Non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

f) Expungement of written warnings, reprimands, negative performance appraisals, and other derogatory information and references which have been placed in Plaintiff's personnel file;

g) Posting of a notice to MSA's employees indicating that MSA has been ordered to comply with 41 U.S.C. § 4712 and to make appropriate restitution to Plaintiff;

h) Reasonable costs and attorney's fees, together with the cost of expert witnesses;

i) MSA should be ordered to provide a neutral employment reference, to include dates of employment, job title, and final wage rate, to all potential employers regarding Plaintiff in the event reinstatement is not ordered;

j) All other relief that may be available from law and equity.

k) Plaintiff demands trial by jury.

Dated: December 29, 2025

                                                Respectfully Submitted,

                                                _____/s/ Joshua Erlich_____
Joshua Erlich (VA Bar No. 81298)
The Erlich Law Office, PLLC
1550 Wilson Blvd, Ste. 700
Arlington, VA 22209
(703)791-9087

Stephani L. Ayers (pending admission application via *pro hac vice*)
Government Accountability Project
POB 1061
Medford, OR 97501
stephania@whistleblower.org
(813) 382-7865 (mobile)

*Attorneys for Plaintiff*