# Exhibit 1

Office of Inspector General
United States Department of State

SENSITIVE BUT UNCLASSIFIED

January 2, 2024

**MEMORANDUM**

FROM: OIG/ESP – Jeffrey D. McDermott, Assistant Inspector General

TO: A/OPE – Michael W. Derrios, Procurement Executive

SUBJECT: Report of Investigation Pursuant to 41 U.S.C. § 4712
OIG Whistleblower Case 2023-0136 (Dr. Carolyn Olech)

The Office of Inspector General (OIG) is required to investigate complaints filed by employees of contractors, subcontractors, grantees, subgrantees, or by personal services contractors (PSC), who provide credible information alleging that they were subjected to reprisal for whistleblowing activity.[1] Upon completion of the investigation, OIG is required to submit a report of the findings of its investigation to the complainant, the contractor or grantee concerned, and the head of the agency. Not later than 30 days after receiving the report of OIG's findings, the head of the agency concerned is required to determine whether there is a sufficient basis to conclude that the complainant was subjected to a reprisal prohibited by law and to either issue an order denying relief or taking one or more of the remedial actions specified in the law.[2]

On February 2, 2023, OIG received a complaint from Dr. Carolyn Olech, a former staff veterinarian with Michael Stapleton Associates (MSA),[3] a Department of State (Department) contractor that, among other things, procures and trains canines for explosive detection teams deployed by the Department. MSA also monitors canines given to partner countries as part of the Department's foreign assistance programs. Dr. Olech alleged that MSA placed her on paid administrative leave and subsequently terminated her employment after she raised concerns of employee misconduct and other issues to MSA management, OIG, and the Virginia Board of Veterinary Medicine, a division of Virginia's Department of Health Professions (DHP).

OIG found that while Dr. Olech made at least one protected disclosure that contributed to the termination of her employment, MSA provided clear and convincing evidence that it would have taken the adverse personnel actions regardless of her disclosures.

[1] 41 U.S.C. § 4712.

[2] 41 U.S.C. § 4712(c)(1). The Department of State delegated this responsibility to the Procurement Executive.

[3] Michael Stapleton Associates is also known as MSA Security.

**Allegations**

On February 2, 2023, OIG received a whistleblower reprisal complaint from Dr. Olech alleging that MSA placed her on paid administrative leave and subsequently terminated her employment as reprisal for reporting to MSA management and others that a Veterinary Technician (Vet Tech) employed by MSA was routinely tardy or absent from work and that on several occasions smelled of alcohol and appeared to be inebriated. Dr. Olech reported that the Vet Tech's behavior compromised the care provided to the canines. Dr. Olech also provided evidence of the Vet Tech's use of alcohol to OIG employees and the DHP. She later participated in an investigation by DHP regarding the Vet Tech practicing medicine on a canine without a valid license.

OIG reviewed the complaint and determined that it contained sufficient details to support a potential violation of the prohibition of retaliation for making a protected disclosure and that it was filed within three years after the alleged reprisal.[4] Therefore, OIG initiated an investigation into the allegations.

**Background**

On June 6, 2016, MSA hired Dr. Olech as a veterinarian responsible for the health care of the canines at the Canine Validation Center (CVC)[5] in Winchester, Virginia. Dr. Olech served in this position until MSA terminated her employment on July 19, 2022. The Lead Veterinarian for the Canine Wellness and Support Department served as her direct supervisor through most of her tenure. The Lead Veterinarian became the MSA Program Manager (PM) at CVC in March 2021, and in this role, he signed Dr. Olech's administrative leave and termination letters in 2022.[6]

From mid-2016 through the end of 2018, Dr. Olech raised concerns to the PM about the Vet Tech's tardiness and absences.[7] She also reported to the PM, the former Program Manager, and the Deputy Program Manager (DPM) that she and other MSA staff believed that, at times, the Vet Tech consumed alcohol prior to arriving to work and she was intoxicated while at work.[8] Dr. Olech relieved the Vet Tech of her duties on several occasions in 2018, because she believed the technician was intoxicated and posed a danger to the canines. On May 15, 2018, MSA counseled the Vet Tech about her alleged alcohol use. The discipline record stated that MSA had previously counseled the technician about this issue as other MSA employees reported that they smelled alcohol on the technician's breath on several occasions.

---

[4] 41 U.S.C. § 4712(b)(4) requires a complaint be brought no more than three years after the date on which the alleged reprisal took place.

[5] The CVC's name changed several times over the years, but OIG refers to it as the CVC throughout this report.

[6] For simplicity, this individual will be referred to as the PM throughout this memorandum.

[7] On June 21, 2017, MSA counseled the Vet Tech about her tardiness and absenteeism.

[8] Use of alcohol on MSA premises is a violation of MSA's Code of Conduct. This section of the Code of Conduct is based on state and federal law, including the Drug Free Workplace Act of 1988. 41 U.S.C. § 8102.

Additionally, MSA warned the Vet Tech that her continued misconduct could lead to her termination.

In June and August 2018, Dr. Olech also met with OIG employees during a review of the Department's canine program. During those meetings, she told OIG employees about the Vet Tech's abuse of alcohol and mistreatment of canines, among other issues.

In early 2019, DHP investigated the Vet Tech's misconduct regarding alcohol abuse. Dr. Olech was interviewed and provided evidence during this investigation. The Vet Tech admitted to consuming alcohol to the extent that she was unable to practice veterinary medicine with reasonable skill and safety. In 2020, following the DHP investigation, the Vet Tech indefinitely lost her license to practice as a veterinary technician in Virginia. MSA confirmed that even though the Vet Tech no longer had a license, she was still employed with MSA and working at the CVC in an administrative position.

On August 6, 2021, a canine in MSA's training program latched onto the arm of a trainer. MSA employees had to physically separate the canine and the trainer. During the incident, MSA employees gave the canine tranquilizers to subdue him. The trainer left by ambulance and the canine was taken to one of the animal hospitals at the CVC. Another veterinarian and the Vet Tech performed what the PM and DPM called "heroic measures," but were unable to resuscitate the canine.[9] Dr. Olech arrived at the animal hospital during the incident and witnessed some of these interactions. Dr. Olech created an Encounter Note[10] and documented the incident in MSA's ClioPro internal record-keeping system.[11]

On February 7, 2022, DHP sent notice to the Vet Tech and the veterinarian that it was investigating allegations that the Vet Tech operated as a veterinary technician without a valid license when tending to the canine on August 6, 2021. The notice from DHP included the Encounter Notes of the incident written by Dr. Olech, which are Department documents. A Department official who managed the canine program directed MSA to investigate the source of the release of documents to DHP without prior Department approval.

Thereafter, the PM assigned the DPM to investigate how DHP came into possession of the Encounter Notes. The DPM and MSA's Information Technology (IT) department conducted a forensic review of the ClioPro system and noted that on January 12, 2022, six months after the incident, Dr. Olech had accessed records of the incident "a bunch of times" and downloaded sixteen different files related to the canine's death. The DPM and MSA IT also conducted a

---

[9] At that time, the Vet Tech's license had already been suspended.

[10] Encounter Notes are the medical records written about the incident. These notes include the examination of the dog, the diagnosis, medications given, and other items, and they are considered Department documents pursuant to MSA's contract with the Department.

[11] When a medical person has contact with an animal it is documented and maintained in MSA's internal computer system known as ClioPro.

forensic review of Dr. Olech's email account and found "suspicious activity."[12] Specifically, the DPM said that on January 13, 2022, Dr. Olech deleted her internet browser history. Additionally, Dr. Olech deleted all her emails between December 14, 2021, and February 3, 2022, and she emptied her sent and deleted items dated before February 2022.[13] They reviewed several years of Dr. Olech's history and discovered that she had never deleted this many emails before. The DPM stated that it appeared that Dr. Olech had sent documents or emails from her work email address to her personal email address, which he stated was not allowed by MSA policy. The DPM verbally advised the PM about his findings and prepared a summary report about his investigative actions and provided it to MSA's legal counsel.[14]

The DPM told OIG that he believed that providing the Encounter Notes related to the August 6, 2021, incident to DHP without permission from the Department violated MSA's Code of Conduct.[15] While the DPM never found direct evidence that Dr. Olech was the person who sent the documents to DHP, she was the only employee investigated and the presumption was that she was responsible for the release. Dr. Olech told OIG that she did not send the Encounter Notes to DHP or to any other third party.

Based on the DPM's initial findings, the PM, with the Chief Human Resources Officer's concurrence, placed Dr. Olech on paid administrative leave on February 24, 2022. The PM directed Dr. Olech to return all MSA equipment and records in her possession, including printed documents physically removed from the CVC and records electronically transferred. He advised her that MSA would continue to investigate the suspected destruction of records. The PM signed the notice of administrative leave, which stated in part:

> A preliminary examination of the MSA devices and systems in your possession or under your control indicates that you deleted and/or destroyed records generated during the performance of the work under the Global Canine Center Contract. If that is the case, you will have failed to comply with the Code of Conduct and caused MSA to breach its obligations under the Global Canine Center Contract.

On July 8, 2022, outside counsel for MSA interviewed Dr. Olech and she admitted to repeatedly emailing Department documents, including canine records and incident reports, to her personal

[12] The DPM and MSA IT did not review any other MSA employee's records during their investigation.

[13] Dr. Olech denied that she deleted emails related to the August 6, 2021, incident or deleted documents with the intent to hide them. She said some emails went missing after a system upgrade and that she moved emails to files or archived them after finishing a project.

[14] MSA did not provide the summary report to OIG. MSA's outside counsel claimed the report was privileged as MSA's general counsel was involved in the decision to investigate Dr. Olech.

[15] MSA's Code of Conduct states "All materials pertaining to or developed for MSA are considered confidential." It further states "Employees must agree to hold such information in strict confidence and shall not at any time… directly or indirectly divulge, disclose or make use of, for any purpose whatsoever, any of such trade secrets or other confidential or proprietary information."

email address. Outside counsel directed Dr. Olech to return all Department documents in her possession by July 13, 2022.

On July 15, 2022, after Dr. Olech made no attempts to return any Department documents, the PM recommended to MSA's Chief Human Resources Officer that MSA terminate Dr. Olech's contract. The PM told OIG that he could no longer trust Dr. Olech to properly safeguard and ensure the confidentiality of government-owned documents.

On July 18, 2022, DHP interviewed Dr. Olech regarding the August 6, 2021, incident. She told DHP that she witnessed employees, including the Vet Tech, attempting to treat the canine and that MSA had failed to create an After-Action Report or a Morbidity and Mortality Rounds report regarding the incident.

On July 19, 2022, MSA terminated her employment for cause. The termination letter stated, "You are being terminated for your admitted violations of the MSA Code of Conduct and the Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement.…Despite your competence as a veterinarian, given your inability to adhere to MSA's and [Department's] security practices and procedures, this termination is necessary to protect and preserve the security of the federal government contract that MSA performs at the [CVC]." [16]

**Legal Standard**

Section 4712 of Title 41 of the U.S. Code prohibits taking an adverse personnel action or otherwise discriminating against an employee of a contractor, subcontractor, grantee, subgrantee or personal services contractor in retaliation for having made a protected disclosure. A protected disclosure is a disclosure of information the employee reasonably believes "is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant."[17] In addition, to qualify as a protected disclosure, the disclosure must be made to a Member of Congress or a representative of a committee of Congress, an Office of Inspector General, the Government Accountability Office, a Federal employee responsible for contract or grant oversight or management at the relevant agency, an authorized official of the Department of

---

[16] MSA's Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement, which Dr. Olech signed on May 15, 2016, states: "During the term of my employment, and for all times thereafter, I will treat as confidential and, except as required in the performance of my employment duties and responsibilities, will not disclose, publish, use, or otherwise make available to the public or to any individual, firm or corporation any confidential information….All confidential information, together with all notes and records relating thereto, and all copies, duplicates, reproductions, facsimiles or except thereof in my possession, are the exclusive property of the Company. I will return promptly all such materials to the Company upon the termination of my employment or upon the Company's demand."

[17] 41 U.S.C. § 4712(a)(1).

Justice or other law enforcement agency, a court or grand jury, or, a management official or other employee of the contractor, subcontractor, grantee, subgrantee, or personal services contractor who has the responsibility to investigate, discover, or address misconduct.[18]

The legal burdens of proof specified in 5 U.S.C. § 1221(e) are controlling for section 4712 investigations conducted by an Inspector General.[19] Pursuant to 5 U.S.C. § 1221(e), an employee must present evidence that he or she made a protected disclosure, which was a contributing factor in a personnel action taken against him or her.[20] The employee can establish this through direct evidence or through circumstantial evidence such as evidence that (a) the official taking the personnel action knew of the disclosure and (b) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.[21]

Once the employee has met this burden, the burden of proof shifts to the employer, which must present clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.[22]

In *Carr v. Social Security Administration*, the court adopted the following test:

> [W]hen determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, . . . the following factors [should be considered]: the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.[23]

The courts have defined clear and convincing evidence as the degree of proof "which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'"[24] It is "that measure or degree of proof that produces in the mind of the

---

[18] 41 U.S.C. § 4712(a)(2).

[19] 41 U.S.C. § 4712(c)(6).

[20] The Merit Systems Protection Board (MSPB), which adjudicates federal employee whistleblower cases, has held that an employee must demonstrate by a preponderance of the evidence that the protected disclosure was a contributing factor in the personnel action. *Caddell v. Dep't of Justice*, 52 M.S.P.R. 529 (Jan. 31, 1992). A preponderance of evidence is considered the lowest standard of proof; the burden of proof is met if there is greater than a 50 percent chance that, based on all the evidence shown, the complainant's claims are true.

[21] 5 U.S.C. § 1221(e)(1).

[22] 5 U.S.C. § 1221(e)(2); *Carr v. Social Security Admin.*, 185 F.3d 1318, 1322 (Fed. Cir. 1999).

[23] 185 F.3d at 1323 (citing *Geyer v. Dep't of Justice*, 70 M.S.P.R. 682, 688, aff'd, 116 F.3d 1497 (Fed. Cir. 1997)).

[24] *Rd. & Highway Builders, LLC v. U.S.,* 702 F.3d 1365, 1368 (Fed. Cir. 2012) (citing *Am-Pro Protective Agency v. U.S.*, 281 F.3d 1234, 1240 (Fed. Cir. 2002)).

trier of fact a firm belief as to the allegations sought to be established" and is a higher standard than preponderance of the evidence.[25] It is an "intentionally high standard of proof."[26] However, an employer does not need to prove each of the factors by clear and convincing evidence. Rather, the three factors will be weighed together to determine whether the evidence is clear and convincing, and a strong showing on one factor may be sufficient.[27]

**Complainant's Burden**

Dr. Olech made several disclosures over the years that she claims contributed to her termination. OIG found that some of the disclosures qualify as protected under section 4712, and that Dr. Olech provided sufficient evidence to conclude that at least one of these protected disclosures contributed to her termination.

Dr. Olech demonstrated by a preponderance of the evidence that she made a protected disclosure when she raised concerns about the Vet Tech's use of alcohol to MSA management and OIG.[28] Dr. Olech raised the concerns to MSA management responsible for addressing misconduct and to OIG, both identified recipients of disclosures under section 4712. Additionally, she reasonably believed that the Vet Tech's continued issues with alcohol were a violation of a law, rule, or regulation related to the contract.[29] A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions were improper.[30] MSA's Code of Conduct contained language that prohibited the use of alcohol on MSA premises. It states that the language was based on state and federal law and references the Drug Free Workplace Act of 1988. All MSA employees received periodic training of the Code of Conduct and therefore Dr. Olech was familiar with the requirements. She said that she witnessed the Vet Tech acting inebriated and smelling of alcohol several times while at work. Additionally, other MSA employees reported the Vet Tech's suspected abuse of alcohol. MSA management counseled the Vet Tech on the use of alcohol at work and later the DHP indefinitely suspended her veterinary technician license following an investigation of her alcohol abuse. Therefore, Dr. Olech's belief was both subjectively and objectively reasonable.

However, OIG could not establish that this protected disclosure was a contributing factor to the adverse personnel actions either by direct or circumstantial evidence. As noted above, to find

[25] 5 C.F.R. § 1209.4(e).

[26] *Chambers v. Dep't of the Interior*, 2011 M.S.P.B. 7, 28 (Jan. 11, 2011).

[27] *Lucchetti v. Dep't of Interior*, 2017 MSPB LEXIS 743, 11 (Feb. 15, 2017) (*citing Phillips v. Dep't of Transportation*, 113 M.S.P.R. 73, 77 (2010)).

[28] She also raised concerns about the Vet Tech being excessively tardy and absent from work, but this information does not fit into one of the categories of disclosures outlined in section 4712.

[29] MSA's contract with the Department included a "Standards of Conduct" section that listed behaviors which entitled MSA to remove an employee for cause. Abuse of alcohol was one of the categories. SAQMMA16D0106, Section H-013, Standards of Conduct.

[30] *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999).

circumstantial evidence, a personnel action must occur within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action.[31] Dr. Olech raised concerns about the Vet Tech's use of alcohol from mid-2016 to the end of 2018, over three years before MSA placed her on paid administrative leave in February 2022 and terminated her contract in July 2022. This gap is too long an interval to qualify as a contributing factor in the adverse personnel action.[32]

However, Dr. Olech also asserted she made protected disclosures to DHP in its investigation of allegations that the Vet Tech acted as a veterinary technician without a license in violation of law. Section 4712 does include disclosures to an "authorized official of the Department of Justice or other law enforcement agency."[33] Neither the statute nor caselaw provide any further guidance as to what constitutes a "law enforcement agency." Virginia law states that "the [DHP] Director and investigative personnel appointed by him shall be sworn to enforce the statutes and regulations pertaining to the Department, the Board, and the health regulatory boards and shall have the authority to investigate any violations of those statutes and regulations."[34] When the meaning of a whistleblower protection statute is unclear from its text, courts tend to construe it broadly, in favor of protecting the whistleblower.[35] Therefore, OIG finds that DHP constitutes a law enforcement agency under the statute.

As noted above, while Dr. Olech asserted that she did not provide the MSA documents to DHP, she was interviewed by the agency and provided information about potential violations of the law. Dr. Olech was an experienced veterinarian and was trained on licensing requirements for veterinary practice and therefore had a belief in her disclosures that was both subjectively and objectively reasonable. In a July 15, 2022, email from the PM to the Chief Human Resources Officer directing Dr. Olech's termination, the PM acknowledged his awareness of Dr. Olech's planned interview with DHP. Additionally, DHP interviewed Dr. Olech on July 18, 2022, the day before her termination, which is a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. Therefore, the burden shifts to MSA to prove its actions were not taken in reprisal for whistleblowing.

---

[31] The MSPB has found periods of more than a year between the disclosure and the personnel action sufficient to establish the connection. *See Inman v. Dep't of Veterans Affairs*, 112 M.S.P.R. 280, ¶ 12 (Sept. 8, 2009) (finding a period of 15 months meets the timing test). *Redschlag v. Dep't of the Army,* 89 M.S.P.R. 589, ¶ 87 (Sept. 6, 2001) (concluding 18 months was acceptable to find the disclosure was a contributing factor in a personnel action).

[32] A two-year gap between the disclosures and the allegedly retaliatory action is too long an interval to justify an inference of cause and effect between the two. *See Costello v. MSPB,* 182 F.3d 1372, 1377 (Fed. Cir. 1999).

[33] 41 U.S.C. § 4712(a)(2)(E).

[34] Va. Code Ann. § 54.1-2506(A).

[35] *Haley v. Retsinas,* 138 F.3d 1245, 1250 (8th Cir. 1998).

**Employer's Burden**

An employer must present clear and convincing evidence that it would have taken the same adverse action against the employee regardless of any whistleblowing activity.[36] In examining each of the *Carr* factors outlined above, OIG reviewed relevant emails and other documents and interviewed Dr. Olech and MSA employees and found clear and convincing evidence in support of MSA's decision to place Dr. Olech on paid administrative leave and subsequently terminate her contract.

The first factor that the courts use to weigh whether an employer has met its burden is the strength of the evidence in support of the personnel action. In examining this factor, the Merit Systems Protection Board examines the evidence supporting the personnel action and whether there were "legitimate reasons" for the action.[37]

MSA officials said that the decision to terminate Dr. Olech's employment was based on her removal, deletion, and destruction of confidential, government documents without legitimate reasons or proper authorization. MSA contends that Dr. Olech's actions were a violation of its Code of Conduct, its Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement that Dr. Olech signed in May 2016, and contradictory to its contract with the Department.[38] Additionally, MSA claims that they requested Dr. Olech return all the documents she removed but the request went unfulfilled.[39]

Dr. Olech admitted that she had printed confidential canine information and sent Department documents to her personal email in anticipation of providing them to federal regulators and DHP, even though she claims that she never did end up sharing the documents. MSA's internal investigation found that Dr. Olech also deleted several months of emails. Regardless of her intent, she provided no legitimate reason to MSA for her actions. Her removal and deletion of documents, and then failure to return the documents when directed, appears to violate the provisions of the polices cited by MSA that prohibit staff from disclosing or publishing any documents without permission and failing to return materials on demand. Her failure to abide by these policies provides strong evidence of legitimate reasons supporting MSA's decision to place her on paid administrative leave and terminate her employment.

---

[36] 5 U.S.C. § 1221(e)(2); *Carr*, 185 F.3d at 1322.

[37] *Baker v. Dep't of Defense*, 2016 MSPB LEXIS 4567, 30 (Aug. 4, 2016).

[38] MSA's contract with the Department says: "All documents and records (including photographs) generated during the performance of work under this contract shall be for the sole use of and become the exclusive property of the U.S. Government. Furthermore, no article, book, pamphlet, recording, broadcast, speech, television appearance, film or photograph concerning any aspect of work performed under this contract shall be published or disseminated through any media without the prior written authorization of the Contracting Officer…. The Contractor shall include the substance of this provision in all contracts of employment and in all subcontracts hereunder.

[39] Dr. Olech told OIG she thought her attorney had returned all the documents that she had in her possession to MSA. However, emails reviewed by OIG indicate her attorney may not have returned the documents.

The second *Carr* factor looks at the existence and strength of any motive to retaliate on the part of the officials who participated in the personnel decision. OIG found some evidence that the PM, who recommended the adverse personnel actions, and the Chief Human Resources Officer, who approved the actions, thought that Dr. Olech provided confidential, government documents to DHP, which angered a Department official and spurred a DHP investigation. It is also reasonable to assume that MSA officials would be upset by an investigation into allegations of wrongdoing by a licensing body that had the potential to cast the company in a negative light. However, in the July 15, 2022, email from the PM to the Chief Human Resources Officer regarding Dr. Olech's termination, the PM notes that MSA would not notify Dr. Olech of the termination decision until after her scheduled interview with DHP so that she fully cooperates with its investigation.

The third *Carr* factor examines whether MSA took a similar action against individuals who did not make protected disclosures but were otherwise similarly situated. The PM said he had terminated other veterinarians, but for performance issues and not misconduct. He said that Dr. Olech was the first MSA termination for taking Department property and failing to return it on demand. However, he said MSA had terminated other employees who were not whistleblowers for failing to adhere to MSA policies or because they exhibited behaviors that put MSA at risk of violating its contract with the Department, similar to the circumstances surrounding Dr. Olech's termination. He provided a list of approximately 21 MSA employees that he considered to be in that position with a brief description of the offense. Thus, although MSA did not have a direct comparator to Dr. Olech, it did present evidence that it has terminated employees for violations of the Code of Conduct and other policies.

OIG's examination of the *Carr* factors found strong evidence of a legitimate, non-retaliatory reason in support of the decision to terminate Dr. Olech's employment. OIG also found mixed evidence of retaliatory motive and some evidence regarding similar treatment of employees who were not whistleblowers. Therefore, on whole, OIG found that MSA met its burden and demonstrated by clear and convincing evidence that it would have terminated Dr. Olech's employment regardless of her protected disclosure.

**Conclusion**

Dr. Olech made several protected disclosures and provided sufficient evidence for OIG to find that at least one of these disclosures contributed to her termination. However, MSA provided clear and convincing evidence that it would have taken the same action absent Dr. Olech's disclosure. Therefore, OIG concludes that MSA did not subject Dr. Olech to improper reprisal in violation of 41 U.S.C. § 4712.